UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ERTC EXPRESS LLC,

                             Plaintiff,

                          v.

REGULUS GROUP LLC and XBP GLOBAL
HOLDINGS, INC.,

                            Defendants.

**VERIFIED COMPLAINT**

Civil Action No.:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiff ERTC Express LLC ("Plaintiff" or "ERTC"), by and through its attorneys, Slarskey LLC and Stone & Magnanini LLP, alleges as follows upon personal knowledge as to its own actions, and upon information and belief as to the actions of all others, for its Complaint against Defendants Regulus Group LLC, an Exela Technologies Company, and XBP Global Holdings, Inc., the rebranding and reorganization of Exela Technologies Company (collectively, "Defendants" or "Exela"):

## INTRODUCTION

      1.     ERTC Express LLC ("ERTC") assists thousands of small-business clients in obtaining tax refunds from the federal government to provide relief for business disruptions caused by COVID. To provide additional security for its customers, in 2022, ERTC engaged Exela to provide fiduciary "lockbox" payor services, and entrusted Exela with processing hundreds of millions of dollars in U.S. Treasury refund checks for ERTC and its clients.

      2.     Exela has utterly failed to perform the payment processing services it contracted to provide. As a result, nearly 3,000 small businesses assisted by ERTC (the "ERTC Clients")

1

have been denied prompt payment of refund monies. Making matters worse, Exela is stockpiling many millions of dollars of refund checks, refusing to inventory them for ERTC or forward them to a new fiduciary, designated by ERTC, who can process them.

3. The problems started from the outset of the relationship between Exela and ERTC. But by late 2024, Exela was clearly unable to fulfill its core contractual and fiduciary obligations: it had lost its banking facilities, could not deposit or disburse funds, and was holding a growing backlog of client checks issued by the United States Treasury.

4. Rather than cooperate with ERTC to resolve the crisis created by its failure to perform its duties and obligations, Exela withheld and refused to inventory or forward the checks in its possession, creating a backlog of tens of millions of refund dollars owed to ERTC Clients.

5. Exela leveraged its control over the refund checks to demand payment from ERTC (and new contractual terms) for simply forwarding the checks—terms that ERTC did not want, but was compelled to negotiate under duress in a desperate attempt to recover its clients' refund checks so they could be properly processed. Despite ERTC's acceding to Exela's extortion, even still, Exela is holding checks, unable to process them and refusing to inventory or forward them.

6. As a result of Exela's failures, ERTC Clients have been complaining to ERTC and threatening litigation. Ultimately, ERTC has advanced nearly $1 million to protect itself from client litigation threatened by ERTC Clients who have demanded refund payments that Exela should have processed but was unable to perform.

7. Initially, once ERTC paid the additional fees demanded, Exela was providing inventories and forwarding checks so that they could be processed by a different lockbox provider. However, recently—as provides the basis for ERTC seeking immediate injunctive

relief—Exela has ceased disclosing and refused to disclose the inventory of checks it is holding and, has threatened, if ERTC does not pay Exela eve more money, to *return the ERTC Client checks to the U.S. Treasury Department* or send them directly to ERTC Clients. Either one of these actions would confound the refund process for ERTC and ERTC Clients and cause irreparable harm to the goodwill in the relationship between ERTC, ERTC Clients and ERTC's position in the marketplace. In addition, Exela is believed to be holding many checks that will imminently expire based on the expiration date associated with those checks.

8. ERTC seeks injunctive relief to preserve the status quo and obtain control over its client refund checks so the checks can be processed properly and its clients paid, since Exela has demonstrated its inability to process the checks, and is threatening to return or forward them, or permit them to expire, any of which would irreparably injure ERTC and its clients.

9. Once the status quo is resumed and checks can be processed, ERTC also seeks money damages for the harm that Exela has done by breaching its fiduciary and contractual duties, converting ERTC Clients' refund checks, and employing coercive tactics designed to extract payments and contractual terms to which ERTC did not agree.

**PARTIES**

10. Plaintiff ERTC Express LLC is a Wyoming limited liability company, registered as a foreign entity to do business in New York.

11. Defendant Regulus Group LLC is a subsidiary of Exela Technologies Inc., now XBP Global Holdings, Inc., and is a Delaware limited liability company with its principal place of business at 2701 East Grauwyler Rd., Irving, Texas 75061.

12. Defendant XBP Global Holdings, Inc. is a Delaware corporation with its principal place of business at 2701 East Grauwyler Rd., Irving, Texas 75061.

**JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (diversity), as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14. Personal jurisdiction and venue are proper in this District with respect to Defendants pursuant to 28 U.S.C. 1391(b) and the parties' contractual agreement to litigate disputes in New York.

**FACTUAL ALLEGATIONS**

**A.    ERTC Assists Clients in Obtaining Tax Refunds**

15. ERTC is a leading national provider of federal tax credit processing services for small and mid-sized businesses, representing a broad cross-section of American enterprise. ERTC Clients include family-owned restaurants, dental practices, construction contractors, manufacturing companies, fitness studios, churches, nonprofits, and professional service firms. These businesses operate in every state and across all major industries, ranging in size from single-employee operations to organizations employing several hundred full-time and part-time workers.

16. Thousands of ERTC Clients have been awaiting payment—some for more than three years—for Employee Retention Tax Credit (ERTC) refunds authorized under the CARES Act and the American Rescue Plan Act. The average ERTC claim processed through ERTC Express totals $142,162.80, spread across quarterly refund checks. The continued withholding or delay of these funds has caused and continues to cause substantial financial hardship to affected businesses, impeding their ability to pay employees, meet operating expenses, invest in expansion, and, in many cases, remain in operation.

17. To facilitate refund payments and provide secure processing, ERTC works with "lockbox" payment providers. These are third-party fiduciary vendors who receive refund checks from the United States Treasury Department, deposit them into segregated accounts for the benefit of the ERTC Clients, and then process payment pursuant to a regulated payment statement to assure proper payments to the refund clients and any third-parties entitled to a share of the refund checks.

18. Earlier this year, when it became clear that ERTC's relationship with Exela was devolving, ERTC established an alternate relationship with a nationally chartered bank, regulated by the Office of the Comptroller of the Currency, also to serve as a third-party "lockbox" fiduciary and to process payments on behalf of ERTC and ERTC Clients. Since March of this year, the new processor has processed more than 900 checks, with an average size of approximately $30,000, totaling more than $28 million. These payments are typically turned around within 24 hours of the processor receiving and depositing the respective checks. (Exhibit 1.)

19. The relationship between ERTC and its new processor has generally been smooth and successful, attesting to the fact that these payments can be processed regularly and without delay by a qualified and capable service provider.

20. ERTC's experience with Exela has not been so smooth or successful.

**B.     The Parties' Agreements**

21. ERTC and Exela entered into a Master Services Agreement ("MSA") on March 18, 2022, which established the framework for Exela's provision of lockbox and payor services for ERTC Clients. (Exhibit 2.) The specific services to be performed were further defined in a Teaming Agreement and subsequent Statements of Work ("SOWs"), including an Amended Statement of Work dated August 16, 2022. (Exhibit 3.)

22. These agreements collectively required Exela to act as a fiduciary on behalf of ERTC and ERTC Clients: Exela contracted to (i) receive Treasury refund checks on behalf of ERTC Clients; (ii) deposit those checks into segregated sub-accounts designated for ERTC Clients; and (iii) promptly allocate and disburse the funds according to ERTC's instructions. Exela was also obligated to provide digital mailroom services, including portal images and mail logs within seventy-two hours of mail receipt, and to process and issue payment checks from the deposited funds.

23. These agreements were intended to facilitate the contractual relationships among ERTC, its clients, and one or more third parties who are entitled to a portion of the proceeds from each refund check. To that end, Exela was contractually obligated to disburse the funds according to ERTC's instructions so that ERTC, its clients, and any third parties all received the payments they were owed.

24. The MSA included explicit performance standards. If ERTC reasonably believed Exela failed to meet these standards in any material respect, ERTC was entitled to provide written notice, triggering Exela's obligation to promptly rectify the deficiency at no additional cost to ERTC. In cases of consistent failure, Exela was required to either correct the deficiency or submit a corrective action plan within fifteen business days. If Exela failed to cure or comply, ERTC could terminate the affected portion of the SOW upon thirty days' written notice. (Exhibit 2.)

C.  **Exela's History of Non-Performance and Extortionate Demands**

25. From the outset of the relationship between Exela and ERTC, Exela had demonstrated challenges in maintaining a banking relationship as needed to perform the requisite processing services. Exela ultimately established an account with Bank of Texas from which it began processing payments for ERTC.

6

26. In September 2023, ERTC informed Exela that several of its checks, drawn on the Bank of Texas account, had bounced.

27. In response, Exela stated that the reason for the bounced check was a problem with Bank of Texas employees, who purportedly needed "training" because they had erroneously flagged Exela's accounts for fraud.

28. Exela's banking problems continued through the fall of 2023. In January 2024, Exela employee Wallace informed ERTC that Exela was no longer able even to *deposit* checks into its account at Bank of Texas (let alone issue checks), and thus Exela could not process the refund checks it was receiving from the Treasury Department for ERTC and its clients. (Exhibit 4.)

29. In March 2024 Exela employee Kaushik stated that this was a temporary condition, and Exela was in the process of establishing a new banking relationship with a new institution. Kaushik stated that it would take approximately two months for Exela to resume processing payments.

30. Upon information and belief, Exela never re-established a direct banking relationship to enable it to process refund checks for all of ERTC's clients.

31. Exela continued to receive and hold checks issued by the Treasury Department for the benefit of ERTC Clients. Instead of forwarding the checks to ERTC (since Exela could no longer provide the services it had undertaken to provide), Exela withheld the checks and manipulated the information it provided to ERTC about the inventory of checks it held, all for the benefit of Exela to extract new and more favorable contractual terms from ERTC.

32. ERTC's repeated requests for inventory and the release of the checks were met with obfuscation, resistance, delay, demands, and—ultimately—Exela's outright refusal to cooperate.

33. The situation deteriorated through 2024. Exela's banking problems persisted, and it became entrenched in its inability to process the payments, along with its refusal to simply forward the checks to ERTC to arrange substitute services. Exela—despite its inability to perform under the parties' agreements—continued to demand payment on invoices for services that it had not provided and could not provide, along with *new* payment terms to cooperate with ERTC's requests that Exela forward the checks.

34. In July 2024, Wallace informed ERTC that Exela had been holding checks since March, and that if ERTC wanted Exela to forward the checks, ERTC would need to sign a new statement of work.

35. Kaushik reiterated Exela's position in August 2024: it would not forward the unprocessed checks until ERTC agreed to pay Exela for check-forwarding services.

36. In September 2024, ERTC informed Kaushik that its failure to process the checks constituted a material breach of the parties' agreement. (Exhibit 5.) Rather than cure the breach, Exela again responded with demands that ERTC accept new contractual terms to pay Exela for check-forwarding.

37. In September 2024, Exela purported to "suspend" ERTC's account for nonpayment—despite the fact that Exela had not performed and could not perform the requisite services.

38. In October 2024, Exela sent ERTC an additional invoice for a long period of time during which Exela had not performed.

39. In October 2024, another client of Exela, *Savent Financial, LLC d/b/a TVT Loans* brought suit against Exela based on similar allegations. *See Savent Financial, LLC d/b/a TVT Loans v. Regulus Group, LLC*, Index No. 655800/2024 (N.Y. Sup. Ct. Oct. 31, 2024).

40. By November 13, 2024, Exela owed ERTC and the ERTC Clients more than $1,147,000 in check disbursements.

41. In November 2024, Exela falsely informed ERTC that Exela was on the precipice of establishing a new banking relationship with a new bank, TransPecos, and that it needed ERTC's cooperation to onboard to the TransPecos platform.

42. Upon information and belief, Exela did not establish a banking relationship with TransPecos, and was not on the verge of doing so. Rather, Exela was attempting to establish a relationship with TransPecos indirectly through a company called Unitco, a non-bank, fintech start-up. The relationship with Unitco was not a direct banking relationship, and Unitco could not process checks for all of ERTC's clients, in particular single-member LLCs, which make up a significant number of ERTC's clients.

43. In December 2024, ERTC inquired of Exela because ERTC had not received an inventory of checks received by Exela in the last month.

44. By the end of 2024, Exela's ongoing inability to properly service accounts had caused a massive amount of confusion and frustration to ERTC and various ERTC Clients, promising the re-establishment of banking services that never came.

45. By January 2025, ERTC understood that Exela was holding checks for at least forty-three of its clients.

46. In February 2025, ERTC received the first of litigation demands from one of the ERTC Clients, arising out of Exela's failure to perform its obligations and withholding of checks.

47. On March 17, 2025, Exela issued a purported "non-renewal" notice for its contract with ERTC. There was no contractual basis for this purported non-renewal, which was a contrivance by Exela intended to mask the fact that it had materially breached the parties' agreements, failed to perform for more than a year, and extorted ERTC for nearly a year by withholding ERTC Client's checks while demanding new payment terms from ERTC.

48. On March 20, 2025, Exela directed its leadership team to withhold information from ERTC about the checks that Exela was holding. Exela began threatening that it would return the ERTC checks to the United States Treasury Department if ERTC did not immediately accept the new contractual demands issued by Exela.

49. ERTC succumbed to Exela's extortionate demands, and in March 2025, executed an additional agreement, agreeing to pay Exela into April 2025.

50. From March through May, ERTC pleaded with Exela to forward the checks it was holding, so that ERTC could arrange for alternate processing. Exela did not cooperate.

51. In June, Exela began sending a daily and weekly report to ERTC showing the checks that Exela continued to receive (but did not deposit or process). Exela demanded—as a condition of forwarding the checks to ERTC—that ERTC execute a "Hold Harmless Agreement." ERTC returned it, executed, the same day as necessary to dislodge the checks.

52. Exela issued a shipment of checks to ERTC on June 20, 2025.

53. Following that June 2025 shipment of checks, Exela has refused to release any additional checks, despite its receipt of many more checks for the benefit of ERTC Clients.

54. Exela has taken the position that unless ERTC enters into a new, complex servicing agreement—requiring ERTC to pay for services that it does not need—it will not send the unprocessed checks to ERTC because there is no "mail-forwarding" agreement in place.

55. Exela is also refusing to *close* nearly 1,000 accounts that are no longer necessary, the result of which is to unnecessarily run up fees on ERTC.

56. ERTC does not want to pay Exela for its proposed "mail forwarding" services. The entire point of the parties' agreements and relationship was for Exela to *process and pay* on the refund checks—not act as an unnecessary middle man between Treasury and ERTC.

57. On July 24, 2025, ERTC emailed Exela employees Wallace and Gund regarding fifty-three checks ERTC believed Exela was then holding in its possession, which it had not provided any update on to ERTC since the June shipment of checks.

58. Exela delayed and avoided providing an update to ERTC regarding these checks. Ultimately, on July 30, 2025, Kaushik responded by email to ERTC, again demanding new contractual terms for mail forwarding.

59. ERTC informed Exela that it did not need Exela's services, since it had proved unreliable and unable to process and pay as it had agreed to do.

60. Through August and September, ERTC attempted to negotiate a resolution with Exela, but Exela, specifically Wallace, Thomas, and Kaushik, continued to demand new contractual terms and compensation for services that it had not performed and that ERTC did not need. ERTC just wanted Exela to forward the checks.

61. On October 7, 2025, despite ERTC paying Exela $380,000 between June and October, and receiving no services for months, Exela's Deputy General Counsel Taylor Pensoneau threatened to return or redirect checks to the IRS or to ERTC Clients. (Exhibit 6.) As

ERTC informed Exela on October 7, 2025, ERTC has been proactively issuing direct payments to ERTC Clients for the checks that Exela had been refusing to remit. (Exhibit 7.)

62. Exela's proposal to return the checks to Treasury or send them on to ERTC Clients would wreak havoc in the refund process: by various contractual agreements, the refund proceeds are allocated among ERTC, the ERTC Clients and one or more third parties. The purpose for having a payment processor is to assure that all parties receive their proper share of the proceeds. Returning the checks, or delivering them directly to the ERTC Clients will only foment disputes and further complications in completing the payment process.

63. Despite ERTC's requests for information about the checks that Exela has continued to receive and hold—with no right to hold them—Exela has refused to provide a current inventory of the checks it is holding, or forward those checks to ERTC. (Exhibit 8.)

64. On October 9, Exela issued a demand for payment of $1,196,000 as supposedly "past due" and again stated that it would not "restart service" (*i.e.*, forward the checks at ERTC's direction—*not* process them) unless ERTC agreed to Exela's new payment and contractual demands.

65. The negotiations that took place between these parties from May 2024 into 2025 were not undertaken between willing contracting parties. Exela used its possession of the ERTC Clients' Treasury checks to place ERTC in an impossible position: Exela was holding an inventory of checks that it could not deposit or process for ERTC Clients, as it was obligated to do by contractual and fiduciary obligations. ERTC and its clients were awaiting substantial payments, with ERTC Clients demanding accountability from ERTC. Exela refused to account fully, and told ERTC that it had no intention of forwarding ERTC Clients' checks without a renegotiation, demanding that ERTC (essentially) pay Exela under *new* terms, for check

forwarding services necessitated by Exela's inability to process the refund checks and make the requisite payments.

66.     ERTC's attempts to resolve the impasse—including agreeing to sign hold harmless agreements demanded by Exela as a condition of Exela forwarding the checks to ERTC and even paying some funds to Exela (despite its non-performance)—have been met with shifting demands and continued efforts by Exela to extort new, more favorable terms for itself.

67.     ERTC and its clients have suffered significant financial harm, with ERTC already advancing approximately $1 million to keep certain clients satisfied so that they would not bring suit against ERTC, and denied millions more in payments that should have been processed by Exela. ERTC Clients are waiting for approximately $590 million dollars in tax refund payments to be processed. (*See* Exhibit 9 (email from ERTC Client expressing confusion and frustration with Exela's refusal to provide services).) The trust that underpinned the relationship between ERTC and Exela was irreparably broken. (*See* Exhibit 10 (October 14, 2025 email from Pensoneau threatening to send ERTC's and/or ERTC's clients checks back to senders by October 16).)

68.     ERTC seeks redress for Exela's breach, its wrongful withholding of client checks, funds, and information, and its coercive tactics that left ERTC with no real choice but to play along for a period of time in hopes of recovering.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Breach of Contract**

69.     ERTC realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

70. The MSA, Teaming Agreement, and SOW1 (together, the "Agreement") formed a binding and enforceable contract between ERTC and Exela.

71. ERTC performed all obligations on its part pursuant to the Agreement.

72. The Agreement obligated Exela, *inter* alia, to process/disburse checks to ERTC and promptly provide mail log reports.

73. Exela—as conceded by their own statements—failed to deliver to ERTC the checks and the mail log reports, withheld and failed to notify remittances, conditioned their performance on coerced amendments and payments, and threatened to return instruments.

74. As demonstrated by, *inter alia*, statements by Exela employees, Exela's breaches were knowing, willful, and in bad faith.

75. As a direct and proximate result of Exela's breaches, ERTC was damaged and lost, in excess of $2 million

**SECOND CAUSE OF ACTION**
**Breach of the Covenant of Good Faith and Fair Dealing**

76. ERTC realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

77. Every contract under New York law includes an implied covenant of good faith and fair dealing, which prohibits either party from acting in a manner that would deprive the other of the benefits of the contract.

78. Exela breached this covenant by, among other things, conditioning their performance on coerced amendments and payments and threatening to return instruments.

79. Exela's conduct deprived ERTC of the fruits of the agreements, including its right to checks and mail log reports.

80. As demonstrated by, *inter alia*, statements by Exela's employees, Exela's breaches were knowing, willful, and in bad faith.

81. As a direct and proximate result of Exela's breaches, ERTC was damaged in an amount to be determined at trial, in excess of $2 million.

## THIRD CAUSE OF ACTION
### Unjust Enrichment

82. ERTC realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

83. To the extent the Agreement is deemed unenforceable or rescinded, Exela wrongfully retained benefits by retaining checks during periods of nonperformance at ERTC's expense.

84. In these circumstances, it would be against equity and good conscience to permit Exela to retain the checks.

85. ERTC has been damaged in an amount to be determined at trial in excess of $2 million.

## FOURTH CAUSE OF ACTION
### Breach of Fiduciary Duty

86. ERTC realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

87. The agreements between Exela and ERTC imposed fiduciary obligations upon Exela.

88. Exela has breached its fiduciary duties of loyalty and good faith, including by withholding refund checks and demanding unwarranted payments for its services.

89. Exela has breached its fiduciary duties of care and prudence, including by withholding checks without the ability to deposit them into an appropriate custodial account.

15

90. Exela has breached its fiduciary duty of disclosure by refusing to provide an inventory of checks held or account for the funds and property in its possession.

91. Exela has breached its fiduciary duties of obedience by failing to abide by the terms of the parties' agreements.

92. ERTC has been damaged in an amount to be determined at trial in excess of $2 million.

### FIFTH CAUSE OF ACTION
### Conversion

93. ERTC realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

94. The agreements bestow ERTC with legal ownership and an immediate right of possession to the checks that Exela is withholding.

95. Exela exercised an unauthorized dominion over the checks they are withholding to the exclusion of ERTC's right.

96. ERTC has been damaged in an amount to be determined at trial, in excess of $150 million.

### SIXTH CAUSE OF ACTION
### Tortious Interference with Prospective Business Advantage

97. ERTC realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

98. ERTC had business relations with clients who used Exela's lockbox services.

99. Exela interfered with those business relations when they withheld checks owed to ERTC Clients.

100. Exela acted with the sole purpose of harming ERTC, as shown by their withholding of checks to receive more payments and amendments to the agreements.

101. ERTC's business relations with their clients were harmed, as seen by the communications by ERTC Clients showing frustration with ERTC because they were not receiving the checks owed to them.

102. ERTC has been damaged in an amount to be determined at trial in excess of $2 million.

**SEVENTH CAUSE OF ACTION**
**Declaratory Judgment**

103. ERTC realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

104. A justiciable controversy exists regarding the validity of coercive amendments and Defendants' "non-payment" defense.

105. ERTC seeks declarations that: (a) amendments procured by economic duress are void and unenforceable; (b) any limitation-of-liability cap is unenforceable due to willful misconduct; (c) ERTC's payment pauses were excused because of Defendants' nonperformance and noticed in writing; and (d) Plaintiff owes no further sums.

**PRAYER FOR RELIEF**

WHEREFORE, ERTC respectfully requests that the Court enter judgment in its favor and against Exela on all counts, and for an Order:

a. awarding Plaintiff damages in an amount to be determined at trial to the fullest extent permitted by law, which upon information and belief could exceed $50,000,000 based on the value of checks currently held by Exela, fees paid to Exela, and funds advanced by ERTC to its clients;

b. awarding Plaintiff a full accounting of all instruments received, held, and returned by Exela;

c. rescinding the Agreement and coerced amendments;

d. awarding Plaintiff pre-judgment and post-judgment interest to the extent permitted by law;

e.  awarding Plaintiff its reasonable attorney's fees, costs, and expenses incurred in prosecuting this action, to the extent permitted by law;

f.  and such other and further relief as the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff ERTC demands trial by jury on all claims and issues so triable.

Dated: October 14, 2025  
       New York, New York

SLARSKEY LLC

By: _____  
David Slarskey  
Deepa Devanathan  
767 Third Avenue, 14th Floor  
New York, New York 10017  
dslarskey@slarskey.com  
ddevanathan@slarskey.com  
(212) 658-0661  
OF COUNSEL

STONE & MAGNANINI LLP  
David S. Stone  
55 Hudson Yards, 20th Floor  
New York, New York 10001  
Dstone@smcomplex.com  
(646) 814-3399

*Counsel for Plaintiff ERTC Express LLC*

## VERIFICATION

I, John Souza, Chief Executive Officer of ERTC Express LLC, hereby affirm that I have personal knowledge of ERTC Express LLC and its activities and the allegations of the Verified Complaint, except for those matters alleged upon information and belief, which I believe to be true based on the facts and circumstances of which I am personally aware. If called upon to testify I would competently testify as to the matters stated herein. I verify under penalty of perjury that the factual statements in the Complaint concerning ERTC Express LLC and its activities are true and correct.

October 14, 2025
New York, NY

John Souza
Chief Executive Officer
ERTC Express LLC